IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

YVONNE MARTIN,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     Case No.
                                  )     12-5024-CV-SW-REL-SSA
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
          Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Yvonne Martin seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred (1) in

finding that plaintiff's osteoporosis,[1] right upper extremity deep vein thrombosis[2] and

---

[1]"Osteoporosis causes bones to become weak and brittle -- so brittle that a fall or
even mild stresses like bending over or coughing can cause a fracture.  Osteoporosis-
related fractures most commonly occur in the hip, wrist or spine.  Bone is living tissue,
which is constantly being absorbed and replaced.  Osteoporosis occurs when the
creation of new bone doesn't keep up with the removal of old bone. . . .  Medications,
healthy diet and weight-bearing exercise can help prevent bone loss or strengthen
already weak bones." http://www.mayoclinic.com/health/osteoporosis/DS00128

[2]"Deep vein thrombosis ("DVT") is a condition in which a blood clot (thrombus) forms
in one or more of the deep veins in your body, usually in your legs.  Deep vein
thrombosis can cause leg pain, but often occurs without any symptoms. . . .  Deep vein
thrombosis is a serious condition because a blood clot that has formed in your vein can
break loose, travel through your bloodstream and lodge in your lungs, blocking blood
flow (pulmonary embolism).  In about half of all cases, deep vein thrombosis occurs
without any noticeable symptoms.  When deep vein thrombosis symptoms occur, they
can include:  Swelling in the affected leg, including swelling in your ankle and foot.  Pain
in your leg; this can include pain in your ankle and foot. The pain often starts in your calf
and can feel like cramping or a charley horse.
Warmth over the affected area.  Changes in your skin color, such as turning pale, red or
blue."
http://www.mayoclinic.com/health/deep-vein-thrombosis/DS01005

anticardiolipin antibody syndrome[3] are not severe impairments because the ALJ did not explicitly discredit the plaintiff's testimony, (2) in assessing a residual functional capacity without any medical opinions regarding plaintiff's abilities, and (3) in failing to obtain a medical opinion with regard to plaintiff's functional abilities. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

---

[3]Also known as antiphospholipid antibody syndrome, anticardiolipin antibody syndrome is an autoimmune disorder. "Autoimmune disorders occur if the body's immune system makes antibodies that attack and damage tissues or cells. Antibodies are a type of protein. They usually help defend the body against infections. In APS, however, the body makes antibodies that mistakenly attack phospholipids -- a type of fat. Phospholipids are found in all living cells and cell membranes, including blood cells and the lining of blood vessels. When antibodies attack phospholipids, cells are damaged. This damage causes blood clots to form in the body's arteries and veins. . . . Usually, blood clotting is a normal bodily process. Blood clots help seal small cuts or breaks on blood vessel walls. This prevents you from losing too much blood. In APS, however, too much blood clotting can block blood flow and damage the body's organs. Some people have APS antibodies, but don't ever have signs or symptoms of the disorder. . . . APS can lead to many health problems, such as stroke, heart attack, kidney damage, deep vein thrombosis and pulmonary embolism. . . . Very rarely, some people who have APS develop many blood clots within weeks or months. This condition is called catastrophic antiphospholipid syndrome. People who have APS also are at higher risk for thrombocytopenia. This is a condition in which your blood has a lower than normal number of blood cell fragments called platelets. Antibodies destroy the platelets, or they're used up during the clotting process. Mild to serious bleeding can occur with thrombocytopenia. APS can be fatal. Death may occur as a result of large blood clots or blood clots in the heart, lungs, or brain. . . . APS has no cure, but medicines can help prevent its complications. Medicines are used to stop blood clots from forming. They also are used to keep existing clots from getting larger. Treatment for APS is long term." http://www.nhlbi.nih.gov/health/health-topics/topics/aps.html

## I.      BACKGROUND

On July 16, 2010, plaintiff applied for disability benefits alleging that she had been disabled since June 9, 2010.  Plaintiff's disability stems from residual effects of a past bout with cancer, side effects from a blood medication she was required to take, and Crohn's disease.  Plaintiff's application was denied on September 3, 2010.  On July 27, 2011, a hearing was held before an Administrative Law Judge.  On August 19, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On December 11, 2011, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d

3

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These

4

regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential

evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and

is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of
impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Dan

Zumalt, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

5

**Earnings Record**

The record shows that plaintiff earned the following income from 1984 through

2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1984 | $ 1,925.92 | 1998 | $ 14,456.74 |
| 1985 | 3,217.07 | 1999 | 18,420.08 |
| 1986 | 4,607.20 | 2000 | 18,915.08 |
| 1987 | 2,741.72 | 2001 | 18,380.08 |
| 1988 | 4,306.30 | 2002 | 18,572.08 |
| 1989 | 5,457.77 | 2003 | 20,628.08 |
| 1990 | 6,765.51 | 2004 | 21,780.08 |
| 1991 | 3,047.17 | 2005 | 23,380.08 |
| 1992 | 7,587.29 | 2006 | 29,590.08 |
| 1993 | 447.50 | 2007 | 23,980.08 |
| 1994 | 6,760.00 | 2008 | 21,367.29 |
| 1995 | 8,078.54 | 2009 | 21,509.95 |
| 1996 | 12,068.36 | 2010 | 0.00 |
| 1997 | 12,081.55 | 2011 | 0.00 |

(Tr. at 157).

Although plaintiff testified that she worked until June 10, 2010, and her medical

records reflect that she was working full time up until then, her earnings records do not

reflect any income from 2010.

6

**Disability Report - Field Office**

On August 2, 2010, plaintiff met face to face with D. White of Disability

Determinations (Tr. at 161-163). Plaintiff was observed having no difficulty in hearing,

breathing, understanding, coherency, concentrating, talking, answering, sitting,

standing, walking, seeing, using her hands, or writing (Tr. at 162). The following

observations were noted:

> Claimant is not sure that she has cancer at this time, states the doctors do not
> know either. When she had it in the past, they had to send her biopsy report to
> the Mayo clinic to be read as she has a rare form of cancer usually found in
> males and people of African descent (?) that can't be treated with chemo or
> radiation.
>
> Claimant originally was sent here by Medicaid to file, but decided she wanted to
> file a full application. She became very tearful when talking about her upcoming
> surgery. She is very thin. Her right breast appears smaller than the left breast,
> she showed m[e] a large scar running down her chest where they had to remove
> a large portion fo her breast. (She was wearing a form fitting tank top).

**Function Report - Adult**

In a Function Reported dated August 5, 2010, plaintiff reported that her day

consists of the following: "Being laid off" she gets up and does things in the house like

cleaning and taking care of her husband and dog. She watches television. She gets

fatigued and takes a nap. She goes to the bathroom a lot. She takes care of her

husband, doing his cooking and "every day living". She also cares for her dog by

walking her and feeding her. She has no difficulty with dressing, bathing, caring for her

hair, shaving, feeding herself, or using the toilet. She prepares "complete meals" daily.

It takes her 30 to 60 minutes to prepare a meal, and her condition has not affected her

ability to cook. Plaintiff and her husband both do the household chores -- he does the

outdoor work. Plaintiff does the washing twice a week and she cooks daily. She goes out of the house every day, and when she goes out she drives. She shops in stores by herself three times a week for about an hour. She enjoys being outside, fishing, and watching television. She does these every day but tires easily. When she fishes, her right arm hurts and she has to take a pain pill.

Plaintiff's impairments affect her ability to lift. "Can't lift anything heavy. Can't use my right arm due to a blood clot." Her impairments do not affect her ability to squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others (Tr. at 175). "I can walk OK." She is able to handle stress and changes in routine well, she finishes what she starts, she follows directions well, and she gets along with others.

Plaintiff concluded with a narrative stating that her blood condition causes her to have a shot every night. She has to run to the bathroom because of her Crohn's disease. She has to take pills for osteoporosis. She has a rare cancer and is going to have to have both of her breasts removed as a result. She has neurofibromas of the skin. She gets fatigued easily, she has to take pain pills if she uses her right arm, and her breasts are sore and it is hard for her to rest (Tr. at 170-177).

## B.    SUMMARY OF TESTIMONY

During the July 27, 2011, hearing, plaintiff testified; and Dan Zumalt, a vocational expert, testified at the request of the ALJ.

1.     **Plaintiff's testimony.**

Although in May 2011 plaintiff's oncologist noted in a medical record that she was working full time, she was not working then (Tr. at 27).

At the time of the hearing, plaintiff was 46 years of age (Tr. at 27). She lives in a house with her husband (Tr. at 39). Plaintiff's husband cleans the house because she cannot reach (Tr. at 39). She and her husband both cook (Tr. at 39). Plaintiff starts, but then she cannot stand for very long and her husband takes over (Tr. at 39). Plaintiff can take care of her own personal hygiene except washing her back (Tr. at 39). Plaintiff goes grocery shopping, but her husband has to go with her to push the cart and carry the groceries in (Tr. at 40). Plaintiff's husband makes the bed, changes the sheets and does the laundry (Tr. at 40).

Plaintiff has a high school education (Tr. at 28). Plaintiff last worked on June 10, 2010,[4] at Titus Logistics (Tr. at 28). She was a freight broker and dispatcher (Tr. at 28). She worked there from January 2010 through June 2010 and left there because the company was shut down (Tr. at 28). After that plaintiff looked for work but could not find a job (Tr. at 28). "Jobs were scarce here, hard to find." (Tr. at 29). Plaintiff's boss at Titus Logistics had been her boss for 13 years and he was understanding with respect to her health issues (Tr. at 44). If she had a doctor's appointment or was not feeling well, she was excused from work (Tr. at 45). Once she was diagnosed with Crohn's he knew if she was not at her desk, she was in the bathroom (Tr. at 45).

---

[4]Plaintiff's earnings records show that she earned no income in 2010 or 2011 (Tr. at 157).

Plaintiff now believes she cannot work full time because of her fatigue and her pain (Tr. at 29). She suffers from pain in her back, her arms and her legs (Tr. at 29). Her doctor told her the pain is caused by osteoporosis (Tr. at 29). This limits her ability to stand for more than 30 minutes at a time (Tr. at 29-30). She can sit for 20 to 30 minutes at a time (Tr. at 30). Plaintiff can comfortably lift five pounds (Tr. at 30). She cannot lift any more due to her arms and her back (Tr. at 30). Plaintiff's doctor said a blood clot in her right arm is causing pain (Tr. at 30-31). She had the blood clot about three years before the hearing (i.e., approximately 2008) (Tr. at 31). Plaintiff still has trouble sometimes raising her right arm higher than shoulder level (Tr. at 32-33). Plaintiff is left handed[5] (Tr. at 31). She also has an issue with the rotator cuff in her left arm which prevents her from reaching out in front of her and overhead (Tr. at 31-32). Physical therapy helped to the point where plaintiff could raise her arms better (Tr. at 32). However she continues to experience difficulty with raising her left arm (Tr. at 32).

Plaintiff has no difficulty grasping or holding onto objects (Tr. at 32).

She takes Tramadol for her pain (Tr. at 33). It helps, and after she takes it she no longer has much pain (Tr. at 33).

Q.      Does it help with the pain?

A.      Yes.

Q.      And do you still have pain after you take the medication though?

A.      No.

---

[5]Oddly, Dr. Croy noted on several occasions that plaintiff was right-handed (Tr. at 246, 252, 258, 264, 293).

Q.     You don't?

A.     It doesn't completely take the pain away but it eases the pain.

(Tr. at 33).

Plaintiff then said that without medication she would rate her pain a 10/10 and with medication she would rate it a 7/10 (Tr. at 33). She has no side effects from any of her medication other than osteoporosis (Tr. at 33, 38).

Plaintiff has had a blood disorder for three or four years (Tr. at 34). The disorder makes her blood want to clot (Tr. at 34). She uses a shot of Lovenox every night (Tr. at 34). Osteoporosis is a side effect of the medication (Tr. at 34). She's been on the medication for three years (Tr. at 34).

Restless leg syndrome and Crohn's disease cause plaintiff to be fatigued (Tr. at 34-35). Plaintiff takes a nap once or twice a day for about two hours each time (Tr. at 35).

Plaintiff had a double mastectomy and had implants, they caused an infection and were removed, and then she had implants put back in about seven months before the hearing (Tr. at 36). She had another surgery about a month before the hearing (Tr. at 36). Plaintiff has no limitations from that condition (Tr. at 36).

Plaintiff has diarrhea four to seven times a day because of Crohn's disease (Tr. at 36). She took steroids for a while but it did not help (Tr. at 36). She takes Lexapro now, which is a nerve pill that is supposed to calm her stomach down (Tr. at 36). Plaintiff is in the restroom about ten minutes each time, and her use of the restroom has become more frequent (Tr. at 37).

11

Plaintiff gets leg spasms and her leg jumps even during the day (Tr. at 37). She only sleeps about five hours a night because she wakes herself up jerking (Tr. at 37).

Plaintiff has neurofibromas[6] which are bumps on her skin which get sore and if they get big she has to have them removed (Tr. at 38). These form all over her body, and she gets about three per month (Tr. at 38). She has had ten of them removed (Tr. at 38).

**2.      Vocational expert testimony.**

Vocational expert Dan Zumalt testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform sedentary work but could not do any overhead work (Tr. at 42). The vocational expert testified that such a person could perform plaintiff's past relevant work as an expeditor and personnel clerk (Tr. at 43).

The second hypothetical involved a person who is off task more than 20 percent of the time which would preclude competitive employment (Tr. at 43).

─────────────────

[6]"These are benign, slow-growing nerve tumors . . . [which] commonly occur in patients who suffer from neurofibromatosis, a genetic disorder resulting in multiple tumors throughout the body. They can occasionally occur in patients without this genetic abnormality. Cutaneous neurofibromas grow along small branches of nerves under the skin of patients with neurofibromatosis. They may present as painful lumps under the skin. They are not associated with large nerves, and are easily removed." http://www.columbianeurosurgery.org/specialties/peripheral-nerve/problems-and-treatm ents/nerve-tumors/neurofibroma/

12

**C. SUMMARY OF MEDICAL RECORDS**

On August 19, 2009, plaintiff saw David Croy, M.D., at Oncology and Hematology Center, P.C. (Tr. at 243-248). She was working full time. "She remains frustrated with the injection form of anticoagulation." Plaintiff complained of pain and swelling in her right arm. "She uses Vicodin [narcotic] for same." Dr. Croy noted that plaintiff had been placed on Coumadin (a blood thinner) previously for a history of right upper extremity deep vein thrombosis (blood clot). "The RUE DVT [right upper extremity deep vein thrombosis] was apparently unprovoked." Plaintiff was noted to have a history of Crohn's disease.

Plaintiff had no abdominal pain, no bowel movement frequency, no recent changes in bowel frequency, no bowel urgency, no change in stool, no diarrhea, no constipation, no rectal pain. She had "easy bleeding and a tendency for easy bruising." She had no back pain, no localized joint pain, no localized joint swelling, no bone pain, no limb weakness, no depression, and no emotional lability. Dr. Croy observed that plaintiff was "healthy appearing" and "not chronically ill." He performed a thorough exam and everything was essentially normal except he did note "modest discomfort is elicited with palpation along the medial aspect of the RUE along the biceps margin. . . . [A] preference for right-handedness was observed."

Plaintiff was diagnosed with:

1. Anticardiolipin antibody syndrome

    a. History of right upper extremity deep vein thrombosis

    b.       History of difficulty controlling internalized normalized ratio (INR)[7] -- resulting in life-threatening bleed -- parapharyngeal hematoma.[8]

    c.       Lovenox anticoagulation[9] -- current regimen.

2.       Parapharyngeal bleed/hematoma [see footnote 8] -- resolved.

3.       History of left breast fibrosarcoma protuberans.[10]

4.       Thyroid goiter,[11] followed by ENT

---

[7]International normalized ratio ("INR"): A system established by the World Health Organization and the International Committee on Thrombosis and Hemostasis for reporting the results of blood coagulation (clotting) tests. Under the INR system, all results are standardized. For example, a person taking the anticoagulant warfarin (also known as Coumadin) would regularly have blood tested to measure the INR. The INR permits patients on anticoagulants to travel and obtain comparable test results wherever they are.

[8] A blood clot in the parapharyngeal space.



[9]Lovenox is an anticoagulant that helps prevent the formation of blood clots. Lovenox is used to treat or prevent deep vein thrombosis which can lead to blood clots in the lungs (pulmonary embolism).

[10]Breast tumor.

[11]"Your thyroid is a butterfly-shaped gland located at the base of your neck just below your Adam's apple. Sometimes the thyroid gland grows larger than normal -- a condition known as goiter. Although goiters are usually painless, a large goiter can cause a cough and make it difficult for you to swallow or breathe. Not all goiters cause signs and symptoms. When signs and symptoms do occur they may include: A visible swelling at the base of your neck that may be particularly obvious when you shave or put on makeup, a tight feeling in your throat, coughing, hoarseness, difficulty swallowing, difficulty breathing."

14

5.     Fibrocystic disease of the breast[12]

6.     Osteopenia[13] - BMD [bone mass density] study 04/08/2009

Dr. Croy ordered additional blood work and told plaintiff to continue the Lovenox daily, maintain the Fosamax[14] weekly, and use oral calcium supplements with vitamin D daily.  "She is concerned about the possibility of losing her insurance in the upcoming months. She is advised to call us if this becomes an issue. Stopping the Lovenox is not an option."  She was told to return in six months.

On November 2, 2009, plaintiff had a mammogram and bilateral breast ultrasound performed at St. John's Regional Medical Center (Tr. at 335-336).  The scan showed multiple simple cysts which were "probably benign."  The scan showed no adverse changes since her previous mammogram.  It was recommended that plaintiff return in six months.

On February 2, 2010, plaintiff saw O.E. Dement, M.D., at Women's Health Care Associates for a well-woman check up (Tr. at 242).  The notes state, "She was told that

---

http://www.mayoclinic.com/health/goiter/DS00217

[12]"Fibrocystic breasts are composed of tissue that feels lumpy or rope-like in texture. Doctors call this nodular or glandular breast tissue.  It's not at all uncommon to have fibrocystic breasts.  More than half of women experience fibrocystic breast changes at some point in their lives.  In fact, medical professionals have stopped using the term 'fibrocystic breast disease' and now simply refer to 'fibrocystic breasts' or 'fibrocystic breast changes' because having fibrocystic breasts isn't really a disease. Although breast changes categorized as fibrocystic breasts are normal, they can cause breast pain, tenderness and lumpiness -- especially in the upper, outer area of your breasts." http://www.mayoclinic.com/health/fibrocystic-breasts/DS01070

[13]Slightly abnormal bone density, may lead to osteoporosis.

[14]Slows bone loss while increasing bone mass.

15

she has '[illegible] breast cancer' Dermatofibrosis - dermatosarcoma."  Plaintiff said she

had had breast cancer when she was 40.  Plaintiff said she was taking Lexapro for

depression.  Plaintiff's exam was within normal limits (skin, ears, nose, throat, heart,

thyroid/lymph, lungs, breasts, abdomen, liver, external genitalia, vagina).  Dr. Dement

recommended that plaintiff follow up with her oncologist.

February 23, 2010, plaintiff saw Dr. Croy for an exam and review of test results

related to her anticardiolipin antibody (Tr. at 249-254).  Plaintiff reported good tolerance

to the Lovenox anticoagulation but continued to be frustrated at the injection form of the

medication.  Plaintiff reported recent headaches described as a burning pain (rated a

5/10) in the occipital region[15] lasting four to five minutes and accompanied by some

blurred vision.  She had no visual field loss and could identify no precipitating or

relieving factors.  She denied swelling in her right arm but reported moderate

intermittent pain in her right arm.  The records show that plaintiff was still working full

time.

Plaintiff reported feeling fatigued but denied feeling poorly (malaise).  She

reported that bowel movement frequency had not recently changed, she had no bowel

urgency, no change in her stool, no diarrhea, no constipation, no rectal pain, no

generalized decrease in strength, no feelings of weakness, no back pain, no localized

---

[15]  The occipital region is shown in green.

joint pain, no localized joint swelling, no bone pain, no limb weakness, no difficulty

keeping her balance, no gait disturbance, no difficulty with fine manipulative tasks, no

depression, no emotional lability.  She had good coordination, she was healthy

appearing and not chronically ill.  On exam she had no tenderness in her neck, no

thoracic deformity, no point tenderness, no costovertebral angle[16] tenderness.  Plaintiff's

mental status exam was normal.  Her muscle bulk, muscle tone, and muscle strength

were normal; she had 5/5 grip strength, and range of motion was normal.  "[A]

preference for right-handedness was observed."  Gait and stance were normal. Gait and

tandem gait were performed without difficulty.

Plaintiff had a goiter in the left anterior neck.  Dr. Coy's diagnoses were the same

as after plaintiff's August 19, 2009, visit.  He ordered an MRI of her head because he

had no explanation for her recent headaches:

> [H]er past medical history confirms the listed malignancies of cervical and L
> breast fibrosarcoma protuberans.  Both are remote histories. . . .  She is
> concerned re: aneurysm as she is on anticoagulation. . . .  Scheduling MRI to
> remove those questions and assess for other antatomic [sic] reason for the
> complaint.

Plaintiff was told to continue using Lovenox injections, continue taking the Fosamax

weekly, have a bone mass density test in about two months, and continue taking oral

calcium with vitamin D daily.  "She has not been compliant with follow up with her PCP

---

16



and needs follow up of her abnormal thyroid imaging. . . . She claims to have been told by her GYN that she needs bilateral mastectomy due to her fibrosarcoma protuberans history. I do not have any reason to support that statement."

On March 10, 2010, plaintiff had a brain MRI and an ultrasound of her thyroid performed at Freeman Health Systems (Tr. at 286-287). Her MRI was normal, and the thyroid ultrasound showed multinodular goiter.

On March 11, 2010, Dr. Croy saw plaintiff to go over her test results (Tr. at 255-260). Plaintiff reported good tolerance to the Lovenox anticoagulation therapy. She continued to have unpredictable discomfort in the right arm which had been occurring since her deep venous thrombosis. The record shows that plaintiff was working full time. She admitted to fatigue but not malaise, she continued to have headaches lasting a few minutes or less. She reported that bowel movement frequency had not recently changed, no bowel urgency, no change in stool, no diarrhea, no constipation, no rectal pain, no feelings of weakness, no back pain, no localized joint pain, joint swelling, or bone pain. She had no limb weakness, no gait disturbance, no difficulty keeping her balance, no depression, and good coordination. Dr. Croy performed a thorough physical exam and noted that plaintiff was healthy appearing and not chronically ill. There was no tenderness in her neck. She had no thoracic deformity and no point tenderness, no costovertebral angle tenderness in her back. Her mental status exam was normal. She had normal muscle bulk, tone and strength. She had normal grip strength, normal range of motion in her upper and lower extremities. A preference for right-handedness was observed.

He discussed plaintiff's thyroid ultrasound and her normal brain MRI. He recommended imaging of her cervical spine, suspecting cervical degenerative joint disease as a cause of her headaches.

On May 10, 2010, plaintiff followed up with Dr. Croy (Tr. at 261-266). "She continues to note pain or discomfort in the right proximal upper extremity -- a pattern with has been present since the deep venous thrombosis." Plaintiff was noted to be working full time. She reported feeling fatigued but not feeling poorly. She continued to have headaches but they had slightly improved since the last visit. She had no neck pain, bowel movement frequency had not recently changed, no bowel urgency, no change in stool, no diarrhea, no constipation, no rectal bleeding, no back pain, no localized joint pain, no joint swelling, and no bone pain. She had no limb weakness, no gait disturbance, no difficulty balance, no difficulty with fine manipulative tasks. She had good coordination, no depression. Dr. Croy observed that plaintiff appeared healthy and was "not chronically ill." He performed a thorough exam and noted no tenderness in the neck, no thoracic deformity or point tenderness, no costovertebral angle tenderness in the back. Her mental status exam was normal. Her motor strength was normal and a preference for right-handedness was observed.

X-rays of the cervical spine had been done and the results were discussed with plaintiff. The images were negative for substantial degenerative joint disease or foraminal narrowing. "The etiology of her headache and occipital discomfort is likely tension related." She was told to use ibuprofen.

19

A bone density test had been done and was discussed with plaintiff. She had

borderline osteoporosis at L4, a normal range in the hip and site specific osteoporosis of

the femoral neck.[17] Aside from the osteoporosis, his diagnoses were the same as from

the last visit. He doubled plaintiff's dose of Fosamax and encouraged her to take

calcium and vitamin D supplements daily.

On June 9, 2010 -- plaintiff's alleged onset date -- plaintiff underwent a bilateral

breast MRI at Freeman Health System. (Tr. at 275). There were no findings to strongly

suggest malignancy, but bulky adenopathy[18] was identified and ultrasound was

recommended on the right breast for further evaluation.

On June 21, 2010, plaintiff saw Dr. Croy (Tr. at 290-295). She continued "to note

pain or discomfort in the right proximal upper extremity -- a pattern which has been

present since the deep venous thrombosis." Plaintiff reported fatigue but denied

malaise. She reported headaches but denied blurred vision. She said her bowel

---

[17] 

[18] "Adenopathy is the enlargement or swelling of lymph nodes. The enlargement of
lymph nodes can be detected through physical examination and also by imaging scans.
Enlarged lymph nodes can be caused by cancer, commonly lymphoma, but can indicate
that cancer has spread to the lymph nodes for some types of cancer. Adenopathy is
very common and can occur because of something as mild as having a sore throat to a
more serious condition, like cancer. Cancerous nodes are often hard and affixed to the
surrounding tissues, and are not usually painful. Benign nodes, such as those from
infections, are usually painful."
http://cancer.about.com/od/cancerglossary/g/adenopathy.htm

20

movement frequency had not recently changed, she had no bowel urgency, no change in stool, no diarrhea, no constipation, and no rectal pain. She reported no generalized decrease in strength, no feelings of weakness, no back pain, no localized joint pain, no joint swelling and no bone pain. She reported no depression, no gait disturbance, no difficulty balancing, and no difficulty with fine manipulative tasks. She had good coordination. Dr. Croy observed that plaintiff was healthy appearing and not chronically ill. She had no tenderness of the neck, no thoracic deformity or point tenderness, and no costovertebral angle tenderness. Her mental status exam was normal, her motor strength was normal and a preference for right-handedness was observed. Dr. Croy reviewed the breast MRI studies with plaintiff and noted some increased contrast enhancement but less than expected for malignancy. He suspected fibrocystic disease and recommended further scans.

On June 24, 2010, plaintiff had an ultrasound and a mammogram with spot compression imaging of the right breast which were normal (Tr. at 271-272, 299). The finding was benign with no changes since the April 7, 2010, scan. It was recommended she return in six months.

On June 29, 2010, plaintiff saw Dr. Croy to go over the test results (Tr. at 296-301). In discussing her recent mammogram, plaintiff complained of right upper outer quadrant pain,[19] but she did not mention arm pain on this visit. She reported fatigue but no malaise. Her headaches had apparently resolved as she denied headache and denied blurred vision. She had no neck pain, no back pain, no localized joint pain, no joint swelling, no bone pain, no generalized decrease in strength, no feelings of weakness, no gait disturbance, no difficulty balancing, and no difficulty with fine manipulative tasks. She reported no depression. She said her bowel movement frequency had not recently changed, she had no bowel urgency, no change in stool, no diarrhea, no constipation, and no rectal pain. She had good coordination. Dr. Croy performed a thorough physical exam and noted that plaintiff was healthy appearing and not chronically ill. She had no tenderness of the neck, no thoracic deformity or point tenderness, no costovertebral angle tenderness, and her mental status exam was normal. Dr. Croy explained to plaintiff that her MRI and ultrasound were normal.

---

[19]



The results were negative and this was reviewed with Mrs. Martin today. Her MRI imaging had been notable for some increased contrast enhancement but not suggestive of malignancy. Mammogram and US [ultrasound] findings were consistent with fibrocystic disease. Her exam is consistent with same with the exception of sharp discomfort on exam. She is becoming exasperated with the need for follow up imaging and discomfort and wonders about mastectomy and reconstruction. Discussed in detail pro's and con's of such an approach in benign disease complicated by her hypercoagulable state. I do not recommend.

Dr. Croy prescribed antibiotics and instructed his nurse to call plaintiff in a week to see if the antibiotics were helping her right breast tenderness.

On July 16, 2010, plaintiff applied for disability benefits.

On July 22, 2010, plaintiff saw T. Brad Coy,[20] D.O., a general and vascular surgeon, to discuss bilateral mastectomies (Tr. at 305). "I told her to get on some Primrose cream[21] and try to cut back on her caffeine. She really wants bilateral mastectomies. I discussed that option with her and it is up to her. She will have to see plastic surgery."

On August 2, 2010, plaintiff saw Dr. Croy for an exam (Tr. at 308-312). He noted that she had been to see Dr. Coy about her desire for a double mastectomy. Plaintiff had continued discomfort of the right breast and also reported discomfort of the left

─────────────────────

[20]Not to be confused with her oncologist, Dr. Croy.

[21]"Evening primrose is promoted as an herbal remedy for a very broad range of conditions, including dermatitis, premenstrual syndrome, menopausal symptoms, eczema, inflammation, hyperactivity in children, high cholesterol, asthmatic cough, upset stomach, psoriasis, rheumatoid arthritis, and diabetic nerve damage. Some proponents also believe the plant has anti-cancer properties. Some claims of evening primrose's health benefits are based on the fact that its oil contains the omega-6 fatty acid GLA".
http://www.cancer.org/treatment/treatmentsandsideeffects/complementaryandalternativ emedicine/herbsvitaminsandminerals/evening-primrose

breast but less severe. "She denies skin changes". Plaintiff reported feeling fatigued but not poorly, she had no headache and no blurred vision. Her bowel movement frequency hade not recently changed. She had no bowel urgency, no change in stool, no diarrhea, no constipation, and no rectal pain. She had no generalized decreased in strength, no feelings of weakness, no back pain, no localized joint pain, no joint swelling and no bone pain. She had no limb weakness, no gait disturbance, no difficulty keeping her balance, and no difficulty with fine manipulative tasks. She had good coordination. She reported emotional lability[22] but no depression. On exam, Dr. Croy observed that plaintiff was healthy appearing and not chronically ill. She had no tenderness of the neck, no thoracic deformity or point tenderness, no costovertebral angle tenderness of the back, and her mental status exam was normal.

> The patient's breast exam has not changed. There is substantial discomfort in the RUOQ [right upper outer quadrant, see footnote 19] persisting. The exam is difficult to interpret. She is quite concerned about her previous presentation of the L fibrosarcoma protuberans. It apparently was not definable on imaging initially and persistence by the patient led to biopsy and diagnosis. She feels that the same scenario may be evolving here. Given the above: I feel there is reason to consider her request for bilateral mastectomy and reconstruction. She will continue to follow with Dr. Coy regarding the above. She anticipates a procedure on the 24th of September. We will have her return several weeks post that procedure to review the pathology.

On September 3, 2010, Kenneth Burstin, Ph.D., prepared a Psychiatric Review Technique (Tr. at 323-333). Dr. Burstin found that plaintiff's mental impairment (affective disorders) was not severe. In support of his finding, Dr. Burstin noted that plaintiff has a high school education and did not allege any psychological impairment;

---

[22]A condition of excessive emotional reactions and frequent mood changes.

however, Dr. Dement's findings indicate that she takes medication for depression. Dr. Croy noted anxiolytic Rx [anti-anxiety medication] possibly as a result of her medical condition "as no anxiety d/o [disorder] diagnosis is given, and claimant is consistently described as displaying no evidence of depression or anxiety. Claimant alleges no mental-functional limitations on 3373 [Function Report]." He noted that plaintiff did not allege any mental limitations to her treating doctors, and no one ever observed her with any mental limitations.

On September 3, 2010, plaintiff's application for disability benefits was denied.

On September 24, 2010, the surgeon, Dr. Coy, performed a double mastectomy, and immediately afterward, Steve Hughes, M.D., performed breast reconstruction with silicone gel implants (Tr. at 361-362).

On October 8, 2010, plaintiff underwent a procedure at Freeman Health System performed by Dr. Hughes to drain blood that had accumulated in her reconstructed left breast, and the silicone implant was reinserted (Tr. at 354-355). Plaintiff was released the same day on a regular diet with activity "as tolerated" with special instructions of "light activity".

On October 28, 2010, plaintiff followed up with Dr. Coy, her surgeon (Tr. at 366). Dr. Coy noted some bloody drainage from plaintiff's breasts. He cultured the drainage and packed the area with Iodoform gauze. "I think she can continue with her anticoagulation. I do not think it has anything to do with it."

On November 2, 2010, plaintiff saw Dr. Hughes (the plastic surgeon who performed the reconstructive surgery) for a post-op exam (Tr. at 440). "Still sore but

25

doing well. States right nipple looks different."  Dr. Hughes took the sutures out.  "No problem identified at present. No current sign of infection."

On November 23, 2010, plaintiff saw Dr. Croy, her oncologist (Tr. at 387-392). "She is feeling stronger and more active."  Plaintiff remained on the daily Lovenox injections.  Plaintiff reported feeling tired but no malaise.  She had no headache, no blurred vision, no neck pain, bowel movement frequency had not recently changed, no bowel urgency, no change in stool, no diarrhea, no constipation, no rectal pain, no generalized decrease in strength, no feelings of weakness, no back pain, no localized joint pain, no joint swelling, no bone pain, no limb weakness, no gait disturbance, no difficulty keeping her balance, and no difficulty with fine manipulative tasks. She had good coordination. She reported emotional lability but no depression.  Dr. Croy performed a thorough exam and noted that plaintiff was healthy appearing and not chronically ill.  She had no tenderness of the neck, no thoracic deformity and no point tenderness, no costovertebral angle tenderness of the back, her mental status exam was normal.  Dr. Croy ordered blood work.  "She is having difficulties with maintaining the Lovenox injections due to economic issues. We will refer to Social Services."

On December 11, 2010, plaintiff saw Dr. Hughes for a breast reconstruction consult (Tr. at 440).

On January 8, 2011, plaintiff saw Dr. Hughes for a follow up (Tr. at 439).  Plaintiff reported that the day before she had noticed some bleeding from the right breast, and now she had some bleeding from both sides.  Plaintiff had a fever, and her left breast was swollen and bruised.  Dr. Hughes observed dark blood coming from the incision on

26

the left breast.  Dr. Hughes indicated that the implants needed to be removed and redone.

On January 12, 2011, plaintiff underwent a second breast reconstruction performed by Dr. Hughes (Tr. at 369-379).  There were no complications, and plaintiff had minimal estimated blood loss.  On January 13, 2011, plaintiff called the office to report the amount of drainage from each breast.  Plaintiff was instructed to call Dr. Hughes's office if she did not start seeing a decline in drainage.

On March 7, 2011, plaintiff saw Dr. Croy for a follow up (Tr. at 381-385).  "She has had continued revisions of her breast reconstructions. She denies complaints of bleeding and has had no thrombotic events due to these surgeries. She denies swelling of either UE [upper extremity]. . . .  She denies numbness in the hands or feet."  Plaintiff reported feeling fatigued but no malaise.  She had no headache and no blurred vision. She had no neck pain, no abdominal pain, bowel movement frequency had not recently changed, no bowel urgency, no change in stool, no diarrhea, no constipation, no rectal pain, no generalized decrease in strength, no feelings of weakness, no back pain, no localized joint pain, no joint swelling, no bone pain, no limb weakness, no gait disturbance, no difficulty keeping her balance, no difficulty with fine manipulative tasks, no insomnia, no depression.  She had good coordination.  Dr. Croy performed a thorough exam and noted that plaintiff was healthy appearing and not chronically ill. She had no tenderness in her neck,  no thoracic deformity and no point tenderness, no costovertebral tenderness in her back, and her mental status exam was normal.  He ordered blood work.

27

We discussed her issues with insurance. Her husband's job is likely to complete and subsequently resolve in the upcoming late December [i.e., in approximately nine months]. Her Cobra insurance plan expires along the same time frame. She will not be able to continue the Cobra post that time and the Lovenox injections are going to become a major issue. She has spoke[n] with Social Services and has not been able to formulate a plan. . . . I remain convinced that Lovenox remains the best alternative. . . . She is advised to return in 4 months for exam. . . . NOTE TO NURSING: She still is without a plan for Lovenox injections when her cobra plan runs out? Any help from SS's [Social Services]?? - CAN NOT DO ANYTHING UNTIL SHE ACTUALLY HAS NO INSURANCE, THEN WILL REQUEST DIRECTLY FROM THE COMPANY.

On March 24, 2011, plaintiff was examined at Women's Health Care Associates (Tr. at 400-401). Plaintiff indicated that she was a homemaker. She reported fatigue, irritable bowel syndrome, and "muscle or joint pain". She had no psychiatric complaints. She reported getting no regular exercise and drinking four caffeinated beverages per day. On exam plaintiff's neck was normal, her gastrointestinal exam was completely normal, her skin was noted to be normal, and her psychiatric exam was completely normal.

Plaintiff's notice of administrative hearing is dated April 1, 2011 (Tr. at 78). Her hearing was set for June 28, 2011.

On May 2, 2011, plaintiff saw Dr. Croy, her oncologist (Tr. at 432-437).

She returns today for a new complaint and unscheduled appointment. She is complaining of pain in the L shoulder. Duration: 1 month. Not preceded by a known injury. She reports marked difficulties with pain when reaching behind her

head, attempting to undo her bra and with abduction[23] of the L shoulder. She reports complaints of pain radiating into the L mid humerus. . . .  She reports persistent pain in the medial aspect of the proximal mid humerus.

For the first time, plaintiff reported a generalized decrease in strength.  There were no complaints of bowel movement frequency, abdominal pain, bowel urgency change in stool, diarrhea, constipation, or rectal pain.  Plaintiff said she was afraid she had a blood clot in her left arm.  Dr. Croy performed a thorough exam.  He noted that plaintiff was healthy appearing and had no tenderness in her neck, no thoracic deformity and no point tenderness, no costovertebral angle tenderness in her back, no abdominal tenderness, and her mental status exam was normal.  He ordered blood work and prescribed Ultram [a narcotic-like pain reliever] for her pain.  He ordered films of her shoulder and told her to go to physical therapy.  "She does not have findings on PE [physical exam] to support her concerns of thrombosis [blood clot] in the LUE [left upper extremity]."

On Tuesday, May 10, 2011, plaintiff was initially evaluated at St. John's Therapy Center by Teresa Ragan, a physical therapist (Tr. at 423-424).  Plaintiff indicated that about a month ago she began having trouble with her left shoulder, that she is unable to

---

23



Case 3:12-cv-05024-REL   Document 14   Filed 08/10/13   Page 29 of 51

lift it over shoulder height and unable to reach for things  She said she had an x-ray

"which was clear."  She said her left shoulder pain ranged from a 3/10 to an 8/10.

Recreational activities included playing with her dog and fishing.

Plaintiff's left shoulder ranges of motion were somewhat reduced when

compared to her right arm.  She had tenderness to palpation of the joint and was unable

to get into a comfortable enough position to have left shoulder flexion and abduction

tested.  Plaintiff was given exercises to perform at home and was instructed on the use

of ice and heat.  "Patient has good rehab potential secondary to her pain having only

lasted 1 month and her age."  Plaintiff was to attend physical therapy sessions three

times a week for four weeks (i.e., 12 visits).

June 6, 2011, was four weeks from plaintiff's first physical therapy visit on May

10, 2011, and therefore should have been the approximate end of the 12-visit treatment

plan.  Instead, the records show that she attended physical therapy on May 15, 2011;

May 20, 2011; June 9, 2011; June 10, 2011; June 15, 2011; and June 20, 2011, or six

visits over a six-week period (Tr. at 403-405).

On June 9, 2011, plaintiff went to physical therapy and stated that her right arm

had been bothering her lately.  "She states she feels like her left shoulder has gotten

more stiff since her last visit and c/o [complains of] inability to scratch her back."

Plaintiff had not been seen in therapy since May 20, 2011 (i.e., for 20 days.  The

physical therapy notes from her May 20 visit do not reflect that she was to wait three

weeks before returning (Tr. at 416)).  "Pt continues to c/o cervical [neck] symptoms as

well and entered clinic on today's date with left shoulder girdle elevated and painful."

30

On June 20, 2011, plaintiff had her final physical therapy visit (Tr. at 403).  She had attended an initial visit and six therapy sessions. The plan was "continue with physical therapy plan of care."  However, there are no other physical therapy records available.

Five weeks later, on July 27, 2011, plaintiff's administrative hearing was held.

## D.     LETTERS FROM FAMILY MEMBERS

On September 20, 2010, plaintiff's husband, Richard Martin, wrote a letter to whom it may concern (Tr. at 220-222).  He stated that when they got married, plaintiff had neurofibromas all over her body, and they have gotten worse.  According to plaintiff's application for benefits, they got married on March 11, 1987 (Tr. at 137).  Mr. Martin stated that plaintiff had cervical cancer resulting in a hysterectomy, she developed breast cancer and had to have a portion of her breast removed, she developed a blood clot and had to be put on Coumadin but that caused a reaction and she had to have a tracheotomy, she uses daily shots which cost $2,000 per month, and all of her medication has caused her to have osteoporosis.

> If she had not already been employed & had insurance we would have been wiped out. We were both laid off approx. July 1 of this year.  Once she is healed, I feel that no company in their right mind is gonna hire her and provide insurance for her.  At the moment it is taking every cent we can scrape up to pay Cobra to continue her ins. but that is time limited and about to clean us out.  We are drained of anything we ever had and the only possible relief would be if she can get on disability.  Thank you for anything you can do.

On September 21, 2010, plaintiff's mother, Connie Dale, of Sidney, Arkansas, wrote a letter in support of plaintiff's application (Tr. at 224).  She said it took months for the blood clot in plaintiff's arm to dissolve.  Ms. Dale repeated the list of medical

31

problems about which plaintiff testified.

On September 21, 2010, plaintiff's friend, Tammy Sparlin, wrote a letter on plaintiff's behalf (Tr. at 226-227). Ms. Sparlin did not provide an address and did not indicate how often she sees plaintiff or how she would know the information in her letter. Ms. Sparlin's letter discusses all of plaintiff's medical conditions and medications in the same order as Mr. Martin's letter. She included the cost of plaintiff's medication, again without indicating how she would know what medication plaintiff takes or how much she pays for it. The letter concludes with the following: "I feel if she was to put her applacation [sic] in for a job she would not get it because she is a high risk on insurance. They have scraped up money to pay for her insurance and her doctor bills. They need help."

On September 21, 2010, plaintiff's neighbor, Denise Pierson, an LPN, wrote a letter to whom it may concern (Tr. at 229-230). She had been a friend and neighbor for ten years.

> I know with the recent laying off of both Yvonne and Rick times have been very tough financially for them especially with carrying Cobra insurance which frankly the premiums are outrageous and I know they are struggling to pay this but without it, I can't imagine what would happen with Yvonne medically. I'm a nurse and I just can't fathom this. With the conditions she has suffered and what she has to continually go through on a daily basis I cannot conceive how she can continue to work. The pain alone is so crushing I can't see her continuing on and some of the medicines she is on affects her alertness and it's not advisable to drive on. I also fear now if she does attempt to get another job that her medical conditions are pre-existing and no insurance company will cover her. Continuing with Cobra I would think would not be the best road to take and financially I don't know how they can continue on. Cobra is not the only expense they have in their lives. I have always known the Martin family to be very hard workers and great neighbors! To loose [sic] their jobs was devastating but to watch Yvonne sick and in constant pain and to watch their assets drain is a nightmare! The logical

32

answer here is plain obvious here!  Please reconsider Yvonne Martin for disability.  I've heard of people who are not as sick and in pain as Yvonne receive disability and as a nurse I wonder how in the world did they ever get approved.  I can't see how you could possibly deny her. . . .

On September 21, 2010, Doris Price, plaintiff's aunt and an LPN, wrote a letter to whom it may concern (Tr. at 232).  Ms. Price lives in Horseshoe Bend, Arkansas, and did not indicate how often she sees plaintiff.  She did indicate that plaintiff has to lie down frequently throughout the day and has trouble trying to care for her hair or get dressed.  She did not indicate how she knows these things.

On September 25, 2010, Julie Alford wrote a letter to whom it may concern (Tr. at 234).  Ms. Alford had been plaintiff's neighbor for 20 years.  Ms. Alford described plaintiff's medical history (cervical cancer, Crohn's disease, breast cancer) and commented on all of her medications.

There is no way any employer will hire Jo for any job because of all the health problem[s], even if she was 25 years old.  I also believe that there is no insurance company that will write Jo a policy for health insurance.  Yvonne Jo Martin is one of the people that disability was established for; she has worked all of her life and paid into this benefit.  There is something really wrong to deny a person that is this sick her rightful benefits that she has earned and deserves.

On September 29, 2010, Mike Turner -- plaintiff's boss for 13 years -- wrote a letter to whom it may concern (Tr. at 236).  Mr. Turner indicated that plaintiff had been a good worker, that her medical history progressed, and that her medical history "in my opinion renders Mrs. Martin incapable of future employment."  Mr. Martin described Crohn's disease, a blood disorder which must be monitored, several bouts with cancer resulting in a double mastectomy, a disease causing bumps to occur over her body, an

33

inability to tolerate dairy products or calcium supplements, and restless leg syndrome which hinders her ability to rest normally.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Michael Lehr entered his opinion on August 19, 2011 (Tr. at 10-17).  Plaintiff's last insured date is December 31, 2014 (Tr. at 12).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Step two.  Plaintiff has the following severe impairments:  degenerative joint disease of the left shoulder and Crohn's disease (Tr. at 12).  Plaintiff's osteoporosis is non-severe (Tr. at 13).  Plaintiff's restless leg syndrome is non-severe (Tr. at 13).  Plaintiff's deep vein thrombosis of the right arm is non-severe (Tr at 13).  Plaintiff's status post bilateral mastectomy is non-severe (Tr. at 13-14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work except she cannot reach overhead with her arms or do other overhead work (Tr. at 14).  With this residual functional capacity, plaintiff can perform her past relevant work as an expediter and personnel clerk (Tr. at 17).  Therefore, plaintiff is not disabled (Tr. at 17).

## VI.   SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in finding that plaintiff's osteoporosis, right upper extremity deep vein thrombosis and anticardiolipin antibody syndrome are non-

severe impairments. She states that her claims of these impairments are supported by medical records from Oncology and Hematology Center, P.C., or Dr. Croy's records. Plaintiff cites her testimony that "most of her pain was in her back and in her legs and was caused by osteoporosis. . . [and she] reported unpredictable discomfort in her right proximal upper extremity, which was noted to have been present since the DVT."

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe. Caviness v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001). While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

Plaintiff testified that she could stand only 30 minutes at a time, sit for 20 to 30 minutes at a time, and is limited to lifting five pounds at a time. Plaintiff argues that "the ALJ did not explicitly discredit [plaintiff], or give reasons for ignoring her testimony . . . [or] discuss many of the factors set forth by Polaski, nor did the ALJ cite to that decision."

Plaintiff's argument, therefore, is based on both an improper credibility determination and an improper analysis of Dr. Croy's medical records.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303

36

(8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

37

The specific reasons listed by the ALJ for discrediting plaintiff's subjective

complaints of disability are as follows:

> Claimant testified that pain caused by her osteoporosis, addressed above, was a primary reason she could not work full-time. Additionally, she stated that she could not work because of pain in her arms. She added she could not lift more than five pounds, but that she was making progress with physical therapy. Claimant also testified that she suffered from bouts of Crohn's disease that were unpredictable causing stomach cramps, diarrhea and frequent bathroom visits. While Crohn's disease is managed by symptom treatment, the objective medical evidence does not show a record of complaints to the primary treatment provider that the claimant's Crohn's is significant over a durational period that would require a finding that the claimant would miss many days. Claimant did not testify that she would miss days of work or that she had in the past for this disorder. She stated she had taken steroids in the past, but they were not helping. There is certainly to reason why this condition has not been treated by the primary care physician if its symptoms warranted.

> Claimant added that she was fatigued by a combination of her Crohn's and restless leg syndrome. These conditions cause her to sleep twice a day for one to two hours at a time. These symptoms are also not reported to the primary care physician, nor have they been accounted for in her treatment regimen. The claimant visits providers regularly and can afford care.

> Medical imagery of the cervical spine showed an essentially negative MRI in May 2010. Physical therapy records from June 2011 show that the claimant's pain rating was only five on a ten-point scale, all in regards to her shoulder movements, and that after seven visits claimant's range of motion had significantly improved. The objective medical evidence in this case, including treatment notes do not reflect the type of pain and severity levels that the claimant indicates at hearing. Her pain management regimen has not been adjusted, even though she has seen multiple providers, to reflect her testimony. She takes Tramadol when needed for pain relief, as prescribed by her treating physician, and there is no indication that is not a successful treatment regimen.

> In her function report dated August 2010, claimant says that she was laid off from her previous employer. She states that her day involves getting up, taking care of her husband and her dog and doing things around the house. She describes fatigue from her Crohn's, but according to testimony these symptoms wax and wane and are not described in the objective records as severe. She further states she walks the dog, cares for and feeds her husband, has no problem with personal care habits, does laundry and dishes and shops for household needs.

She has a drivers license and operates a motor vehicle. These activities of daily living suggest that the claimant is not as restricted as the testimony would state. In addition, the claimant testified that her husband did all of the household duties, whereas her function report states that she lakes care of her husband, which would seem to contradict that testimony.

Claimant describes the source of her pain as her shoulders, for which she takes a pain pill. This is corroborated by the physical therapy records and treatment notes, which show that the source of her pain is her shoulder problems, not her osteoporosis, as she testified.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's Crohn's Disease, the objective medical evidence does not show complaints about symptomology related to this condition. The claimant's testimony suggests a severe level of symptomology that occurs when the disease flairs up, but there is no treatment regimen in place, nor does the medical record show that the claimant has been treated for a severity level of symptoms that would need additional accommodation. While the claimant's fatigue may be a problem, the above residual functional capacity limits her to a sedentary exertional level which would address her fatigue difficulties.

As to the claimant's shoulder impairments, her physical therapy records do indicate some improvement, but that the claimant still suffers pain from a range of movement. The claimant does state in her function report that she cannot use her right arm due to a blood clot. However, the medical evidence shows that the claimant's blood clot issue has resolved and she continues on anticoagulant treatment as of her last visit to resolve any additional issues. There is nothing in the medical record stating that the claimant cannot use this upper extremity. The undersigned does, based upon this condition and after an examination of the whole of the medical record, including the claimant's rotator cuff difficulties find that she should be limited from using the upper extremities for overhead work and reaching and so adjusts her capacity accordingly.

(Tr. at 15-16).

I am unclear why plaintiff alleges that the ALJ did not specifically discredit plaintiff's subjective complaints, as my reading of the above clearly shows that the ALJ reviewed the Polaski factors and said why he found parts of plaintiff's testimony either credible or not credible.

> Here . . . the ALJ did not explicitly discredit Martin, or give reasons for ignoring her testimony. Moreover, the ALJ did not discuss many of the factors set forth by Polaski, nor did the ALJ cite to that decision. Instead, the ALJ simply summarized Martin's testimony and medical record and arbitrarily came to the conclusion that she was not credible.

(plaintiff's brief at 14-15).

I disagree. I also note that plaintiff did not indicate what Polaski factors should have been discussed but were not. The ALJ noted that plaintiff left her last job because she was laid off, not because of her impairments. Plaintiff testified she had continued to look for work but that jobs were scarce. "Richard and I have both filed for unemployment" (Tr. at 130). Her daily activities are inconsistent with disability. She reported being able to take care of her husband, cook, dress, bathe, care for her hair, prepare complete meals daily for 30 to 60 minutes at a time, do laundry, drive, fish, and shop in stores alone three times a week for about an hour. She testified that she suffers from pain in her back, arms and legs. However, in just about every medical record, she denied back pain and leg pain. Her arm pain never got worse than it was when she was able to work full time, and the physical therapy records suggest that her arm pain was not that bad as she did not go three times a week for four weeks as originally prescribed.

Plaintiff testified that restless leg syndrome and Crohn's disease cause her to be fatigued and she takes a nap once or twice a day for two hours each time. The records discussed by plaintiff do not include a reference to restless leg syndrome, they do not include any symptoms from her Crohn's disease, and in the only record discussing sleep (March 7, 2011) plaintiff denied insomnia. She consistently reported fatigue, even before her alleged onset date, but never indicated that it required her to take four hours of naps each day. Plaintiff testified that she has diarrhea four to seven times a day, but the medical records clearly show she denied diarrhea or bowel movement frequency or urgency on every visit to Dr. Croy and never mentioned such symptoms to any other doctor.

Plaintiff testified that her medication helps and after she takes her medication she no longer has pain. It was not until her attorney repeated the questioning (after she twice testified that her medication gets rid of her pain) that she suggested that it doesn't really get rid of her pain. She testified that osteoporosis is the only side effect from her medication.

Her functional limitations, by her own admission, do not include an inability to squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others. She said, "I can walk OK." The only time her activity was limited by any doctor was right after surgery when she was told to perform only light activity.

The ALJ discussed the Polaski factors, and my review of the record in light of the Polaski factors supports the ALJ's decision to discredit plaintiff's allegations of disabling

impairments.

Plaintiff states that her claims of osteoporosis, right upper extremity deep vein thrombosis and anticardiolipin antibody syndrome "are supported by medical records from Oncology and Hematology Center, P.C." While that may be true, the fact that a condition exists is not relevant if that condition does not result in some form of functional limitation. 20 C.F.R. §§ 404.1520(c) and 404.1521(a).

On August 19, 2009 -- more than nine months before plaintiff's alleged onset date -- she complained of pain and swelling in her right arm. A previous instance of right arm blood clot was noted in the record. Whether the blood clot caused the arm pain and swelling has never been established by the medical records; however, that fact is irrelevant because the record establishes that plaintiff was able to work full time despite the pain and swelling in her right arm. The records do not show that plaintiff's right arm pain got worse over time.

Dr. Croy noted "modest discomfort" with palpation in plaintiff's right arm. While she was experiencing this arm pain, plaintiff continued to drive, to fish, to take care of all of her personal needs, to do laundry and house cleaning. Even believing what plaintiff said to her doctor and what she reported in her administrative paperwork, the record clearly establishes that plaintiff's right arm pain did not limit her ability to walk, stand, sit, lift, pull, reach, carry, handle, see, hear or speak. In fact, plaintiff was observed in the Social Security office having none of these difficulties, and in her Function Report dated August 5, 2010 (a full year after the visit to Dr. Croy discussed above), plaintiff reported to Disability Determinations that her impairments do not affect her ability to squat, bend,

42

stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks,

concentrate, understand, follow instructions, use her hands, or get along with others.

The only thing she said about her right arm was that she had to take pain pills if she

uses her right arm and she is unable to lift anything heavy.

The inability to work pain-free is not a sufficient reason to find a claimant

disabled. Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir. 1988). Despite the above,

the ALJ gave plaintiff the benefit of the doubt and restricted her to sedentary work with

no overhead reaching due to her complaints of arm pain.

> Claimant's deep vein thrombosis of the right arm has been reported remotely but
> not in the last visits and has been successfully treated in the past by the
> claimant's treatment provider. Claimant still has the use of her arm and her grip
> strength has been reported to be at a normal and acceptable level, according to
> testimony at [the] hearing. There is no evidence of vocational impairment that
> can be corroborated in the objective record and the undersigned finds this
> impairment to be non-severe. In the alternative, the below residual functional
> capacity limitation of no overhead reaching would account for this impairment as
> discussed below, with no impact that would cause it to change.

(Tr. at 13).

The medical records with respect to plaintiff's right arm deep vein thrombosis

consist of the following: She complained of pain and swelling on August 19, 2009, and

modest discomfort on palpation was observed. She reported moderate intermittent pain

in her arm on February 23, 2010, but was still working full time. She reported continued

unpredictable discomfort in the right arm on March 11, 2010, which had been occurring

since her blood clot several years earlier, which establishes that she was able to

perform substantial gainful activity for years with this arm pain. In May of that year her

complaint was the same. On exam, Dr. Croy continued to find no limb weakness. On

June 21, 2010, she reported continued pain and discomfort in her right arm. On June 29, 2010, she did not report arm pain. On March 7, 2011, she denied swelling of the arms or numbness in her hands, and she was found to have no weakness in her arms. Plaintiff reported a generalized decrease in strength for the first time shortly before her administrative hearing, but she had consistently denied decrease in strength on all of her previous visits. When she attended physical therapy, her right arm was better than her left and she mentioned her right arm on only June 9, 2011, when she said her right arm had been "bothering" her lately.

The record clearly reflects that plaintiff's right upper extremity deep vein thrombosis, which occurred years before her alleged onset date, is not a severe impairment because it does not significantly limit plaintiff's ability to perform basic work activities. Even if one were to find that plaintiff's arm pain significantly limits her ability to lift, the ALJ accounted for such a limitation by excluding the ability to perform overhead reaching.

Plaintiff's anticardiolipin antibody syndrome causes no symptoms, but that condition is the reason plaintiff has to use daily Lovenox shots. Although plaintiff expressed frustration over the form of the medicine (shots) and the cost of the medicine, she never indicated that the medication caused her any difficulties. Neither did she ever allege that her anticardiolipin antibody syndrome caused symptoms, not in her medical records, not in her administrative documents, and not in her hearing testimony. This impairment is not severe.

Plaintiff's osteoporosis is a side effect of Lovenox. The ALJ discussed this condition:

> The claimant has been diagnosed with osteoporosis, which she states is a side effect of Lovenox that she was taking. A bone densiometry done in April 2010 showed . . . borderline osteoporosis at the lumber level with site specific osteoporosis at L4, and the low normal range of bone density at the hip level. [B]ecause of the finding from previous imagery, the claimant was placed on a calcium regimen with Fosamax as well as a vitamin supplement. Claimant did testify at hearing that she was in pain in her neck and spine due to her osteoporosis, but this is not reflected in the objective medical evidence, nor the most recent visit to her primary treating physician, nor is there any indication in the previous visits that his was a problem. The claimant also testified that she was on a pain management regiment [sic] that alleviated her pain.

(Tr. at 13).

On May 10, 2010, Dr. Croy discussed plaintiff's bone density test and noted "borderline osteoporosis at L4" which is in the lumbar spine, and "a normal range in the hip" and "site specific osteoporosis of the femoral neck" which is a part of the bone at the top of the leg.

Neck pain. Although plaintiff testified that she suffers neck pain as a result of osteoporosis, I note that there was no finding of osteoporosis in her neck. Further, she denied neck pain on March 10, 2010, June 29, 2010, November 23, 2010, and March 7, 2011. On exam, Dr. Croy found no neck tenderness on February 23, 2010, March 11, 2010, May 10, 2010, June 21, 2010, June 29, 2010, August 2, 2010, November 23, 2010, March 7, 2011, and May 2, 2011; and a medical provider at the Women's Health Care Associates found that plaintiff's neck was normal on March 24, 2011. Plaintiff's one and only complaint of neck pain was to a physical therapist on June 9, 2011, about a month before her disability hearing. No treatment was needed. X-rays of her cervical

45

spine, taken to see if her neck may be causing headaches, were normal.  There simply is no credible evidence that plaintiff suffers from neck pain that significantly interferes with her ability to perform basic work activities.

Back pain.  Although plaintiff testified that she suffers back pain as a result of her osteoporosis, the record does not support that.  Plaintiff specifically denied back pain during medical visits on August 19, 2009, February 23, 2010, March 11, 2010, May 10, 2010, June 21, 2010, June 29, 2010, August 2, 2010, November 23, 2010, and March 7, 2011.  She never complained of back pain to any doctor.

Arm and leg pain.  Plaintiff's arm pain was discussed above.  Plaintiff never complained of leg pain to any doctor.  And on all of the dates listed above with regard to back pain, plaintiff also specifically denied joint pain and bone pain.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's osteoporosis, right upper extremity deep vein thrombosis and anticardiolipin antibody syndrome are not severe impairments, and in so finding the ALJ properly discredited plaintiff's subjective complaints of disabling symptoms as a result of those impairment.

## VIII.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ's residual functional capacity is not supported by the record because there is no medical opinion with regard to her functional capacity and the ALJ failed to obtain such a medical opinion.

The ALJ does not have to rely entirely on a doctor's opinion, nor is the ALJ limited to a simple choice of the medical opinions of record.  Martise v. Astrue, 641 F.3d

46

909, 927 (8th Cir. 2011).  Residual functional capacity assessments are specifically

reserved to the Commissioner, and the ALJ remains the ultimate arbiter of residual

functional capacity. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (Commissioner

uses medical sources to "provide evidence" regarding several factors, including residual

functional capacity, but the "final responsibility for deciding these issues is reserved to

the Commissioner").  The Eighth Circuit has held that an ALJ's residual functional

capacity assessment can be supported by substantial evidence even when no medical

opinion specifically addresses the claimant's work-related limitations.  Steed v. Astrue,

524 F.3d 872, 876 (8th Cir. 2008) (ALJ's residual functional capacity finding based upon

diagnostic tests and examination results); Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.

2000) (the ALJ's residual functional capacity finding was supported by medical evidence

because the ALJ relied on the claimant's treatment records). As long as the record

contains enough evidence to permit the ALJ to reach an informed decision, the ALJ

need not seek additional evidence.  Haley v. Massanari, 258 F.3d 742, 749-750 (8th Cir.

2001); 20 C.F.R. § 416.920b.

      In this case, the ALJ gave several reasons for his residual functional capacity

finding and carefully explained the rationale for his residual functional capacity

assessment.  He cited plaintiff's subjective complaints (even though, as discussed

above, they are not really supported by the record) in deciding to limit her overhead

lifting. The ALJ's finding that plaintiff's subjective complaints were, for the most part, not

credible also influenced his assessment of her residual functional capacity.  He

discussed plaintiff's subjective complaints of pain and other disabling symptoms, the

fact that plaintiff had left work for reasons other than medical impairments, and her daily activities which were inconsistent with her alleged limitations.

A Social Security claimant bears the burden of providing medical evidence to show that he is disabled. 20 C.F.R. § 404.1512. Although an ALJ must ensure that the record is complete, the regulations governing consultative medical examinations, 20 C.F.R. §§ 404.1519a and 419.919a, provide that a consultative examination will be ordered only when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on the claim. See also Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled); Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (ALJ did not err in failing to call a medical expert to testify about spinal disorders and alcoholism when there is other evidence in the record which provides a sufficient basis for the ALJ's decision). The Commissioner has the authority to determine whether there is an inconsistency or insufficiency requiring further development. 20 C.F.R. §§ 404.1520b(c) and 416.920b(c) ("If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency.").

While the ALJ must ensure a complete record in making his assessment, the courts have recognized that, on review, the burden for demonstrating dereliction the duty to develop evidence is steep. See Combs v. Astrue, 2007 WL 2174555 (8th Cir.,

July 30, 2007) (unpublished) (the plaintiff "bears a heavy burden in showing the record has been inadequately developed"). By the time a case reaches district court, a plaintiff must be able to demonstrate that he was actually prejudiced by the ALJ's alleged failure.  Onstad v Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).

Plaintiff points to Lauer v Apfel, 245 F.3d 700 (8th Cir. 2001), in support of her argument that additional opinion evidence should have been sought by the ALJ.  That opinion is not on point. There, the court noted that the ALJ relied on an opinion of one of the claimant's treating neurologists in determining the claimant's mental residual functional capacity; however, that neurologist had not addressed the claimant's mental impairments in his records. The court then stated, "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record. . ."

Here there is no indication that the ALJ was not able to reach a well-informed decision regarding plaintiff's limitations. The ALJ had access to all of plaintiff's treatment records which, as discussed above, clearly establish that although plaintiff suffers from serious conditions, these conditions do not significantly impact her ability to perform substantial gainful activity.  Plaintiff's blood clotting disorder can be life-threatening; however, on a day-to-day basis, that condition does not affect her ability to stand, sit, walk, lift, reach, etc., and the evidence establishes that her treatment for that condition does not either.  Plaintiff's breast issues likewise have been very involved and have resulted in several surgeries.  But the fact remains -- plaintiff's breast issues have not impaired her ability to perform substantial gainful activity.

Had the ALJ ordered a consultative exam or opinion which differed in any substantial respect from the residual functional capacity assessed by the ALJ, I cannot imagine how, given this record, such an opinion would be entitled to much if any weight. The medical records consistently state that plaintiff denied back pain, neck pain, joint pain, and the entire range of symptoms which would be caused by Crohn's disease. The record establishes that plaintiff's arm pain did not worsen over time, and that she was able to work at the substantial gainful activity level for years despite that arm pain. Plaintiff complained of fatigue while she was able to engage in substantial gainful activity, and there is nothing in the records to support an allegation that the fatigue worsened over time.

The ALJ had sufficient evidence to assess plaintiff's residual functional capacity and determine whether she was disabled.

## IX.  CONCLUSIONS

I can certainly understand plaintiff's frustration at dealing with a blood-clotting disorder and multiple breast surgeries on top of losing her job, and my sincere sympathy goes out to her.  However, Social Security disability is not like a savings account -- one cannot pay into the system and then simply withdraw money when a financial need arises.  A claimant is not entitled to Social Security disability benefits unless it can be established that the claimant suffers from a medically-determinable impairment which causes the claimant to be unable to perform any job (available in significant numbers), even if those jobs are not available in the area where the claimant lives.  Heckler v. Campbell, 461 U.S. 458, 460 (1983) ("[A] person must 'not only [be]

Case 3:12-cv-05024-REL   Document 14   Filed 08/10/13   Page 50 of 51

unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.'") (citing 42 U.S.C. § 423(d)(2)(A)).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 9, 2013